IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| Vanguard Fiduciary Trust Company as trustee for the Burlington Northern Santa Fe Investment and Retirement Plan, | ) ) ) ) | Case No. 3:08-cv-44 |
| Plaintiff, | ) ) | **ORDER ON SUMMARY JUDGMENT MOTION** |
| -vs- | ) ) | |
| Dana L. Stuart and Elisha N. Kabanuk, | ) ) | |
| Defendants. | ) | |

Before the Court is Elisha Kabanuk's motion for summary judgment against Dana L. Stuart (Doc. #43). Stuart filed a brief and additional documents resisting the motion (Docs. #60, 61). The Court, having considered all of the briefs and documents filed by the parties, now issues this memorandum opinion and order.

## SUMMARY OF DECISION

Viewing the evidence in a light most favorable to Stuart, and giving her the benefit of all reasonable inferences to be drawn from the facts, the Court concludes there are genuine issues of material fact, and therefore Kabanuk's motion for summary judgment is DENIED.

## FACTUAL BACKGROUND

Lou Ann Tompkins died on July 3, 2007. Elisha Kabanuk and Dana Stuart each claim they should be the beneficiary of Tompkins' 401(k) account, worth between $270,000 and $280,000. At the time of Tompkins' death, Kabanuk was listed as the beneficiary of the 401(k) account (Doc. #1, Exh. A to the Interpleader Complaint). Kabanuk is Tompkins' niece. Before that, from 2002 until July 2, 2007, Tompkins named Stuart the beneficiary (Doc. #43-2, p. 6). Tompkins met Stuart in prison and in 1998 the two began a relationship (Doc. #43-2, pp. 5, 49). Stuart challenges Tompkins' designation of Kabanuk as the beneficiary, claiming Tompkins

lacked the capacity and competency to make such a decision the day before she died and also that she was unduly influenced by Kabanuk's mother and/or Jayne McGhan (Doc. #1, Interpleader Complaint; Doc. #7, Answer and Cross-claim; Doc. #43-2, pp. 42-43).

Stuart and Kabanuk dispute the nature of each other's relationship with Tompkins. Beginning in 1990, Stuart has been in and out of prison (Doc. # 43-2, pp. 7-15). On two separate occasions, the police were called because Stuart purportedly assaulted Tompkins (Doc. #42-3, pp. 17-21). Stuart contends Tompkins has assaulted her as well. In January 2007, Tompkins wrote a letter to Stuart apparently relaying an incident in which Stuart put a gun to Tompkins' head and told her if she did not give Stuart her "BNSF $" she would kill her someday (Doc. #42-7, pp. 32, 66). In this same letter, Tompkins states she never wants to see Stuart again, and Stuart "won't get a dime from [her] anymore." (Id.).

Kabanuk believes Tompkins ended her tumultuous relationship with Stuart, at least by December 2006 (Doc. #43-3, pp. 34-35). Stuart claims, however, that Tompkins said she was ending their relationship "all the time", but they were still together (Id.). Stuart asserts that even in the face of the letters from Tompkins ending their relationship, she spent 12 hours in bed with Tompkins when Tompkins was sick in the nursing home in March 2007 (Doc. #43-2, pp. 29-30). In addition, Stuart called Tompkins at the nursing home until a "password" was required before she could talk to Tompkins (Doc. #43-2, pp. 30-32). Denise Kabanuk claims this was done because she feared for Tompkins' safety. Stuart believes Tompkins' family instituted the password requirement to keep her away and influence Tompkins (Id. at p. 43). Stuart was unable to visit Tompkins because she was incarcerated from 2005 to 2007 (Doc. #43-2, p. 24).

With regard to Kabanuk's relationship with Tompkins, Stuart asserts Tompkins was never close with her family and Tompkins made statements to her that Tompkins' family wanted

her to die because all they want is her money. Stuart claims Tompkins did not see her family very often (Doc. #43-2, p. 54). Stuart also cites to Denise Kabanuk's attempt on June 28, 2007, to change the beneficiary on a life insurance policy Tompkins never owned (Docs. #43-5, p. 35; #43-7, pp. 20-21). Stuart maintains that if the Kabanuks were close to Tompkins, they would have known she did not have a life insurance policy, but instead had a retirement account from her employment with BNSF. She also argues that if Tompkins was competent on the day she signed the piece of paper requesting Mid States Life to change the beneficiary on a life insurance policy, Tompkins would have told her sister she did not have such a policy.

Kabanuk believes that Tompkins did not change the beneficiary on her 401(k) account sooner simply because Tompkins was a procrastinator (Doc. #43-7, p. 22). There is evidence that Tompkins signed the change of beneficiary form while in the hospital on morphine the day before she died (Doc. #43-7, p. 59). Stuart disputes that the signature on the form is actually Tompkins' signature (Doc. #43-2, p. 42). It is undisputed, however, that Denise Kabanuk facilitated the beneficiary change and her husband faxed the change to Vanguard (Doc. #43-7, pp. 24-26).

According to the transcript of a recorded telephone call with Vanguard, Denise Kabanuk initiated the call requesting a change of beneficiary form for her sister's 401(k) account. Denise requested the form be faxed to her because she did not "know how much time she [Tompkins] has left." (Doc. #43-7, p. 59). Denise also noted to the Vanguard representative that Tompkins "floats in and out sometimes." (Id. at p. 60). In a second call that same day, Denise telephoned Vanguard indicating Tompkins "just came to now and . . . hopefully she can answer [the representative's] two questions." (Id. at p. 61). The transcript further indicates Tompkins had difficulty understanding the Vanguard representative and Denise needed to assist Tompkins in

relaying her address, but knew the city and state. (Id. at pp. 61-65). Kabanuk responds the difficulty Tompkins had communicating with the Vanguard representative was because Tompkins only had two teeth, so Tompkins was not easy to understand (Doc. 43-7, p. 24).

In March 2007, Denise Kabanuk petitioned a court to become Tompkins' guardian (Doc. #43-7, pp. 49-54). The petition alleged Tompkins was incompetent to make medical or financial decisions. A Traill County judge signed an order appointing Denise Kabanuk temporary guardian and conservator (Id.). A physician treating Tompkins from June 18, 2007 to July 1, 2007, noted there were periods when Tompkins was disoriented and unable to discuss her care and other times when she was alert and oriented (Doc. #60-3). He does not opine one way or the other whether he believes Tompkins was competent on July 2, 2007, when she signed the beneficiary change.

## DISCUSSION

### I.     Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The burden of proof is on the moving party to establish the basis for its motion. Donovan v. Harrah's Md. Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002). It is axiomatic that the evidence is viewed in a light most favorable to the nonmoving party, and the nonmoving party enjoys the benefit of all reasonable inferences to be drawn from the facts. See, e.g., Vacca v. Viacom Broad. of Mo., Inc., 875 F.2d 1337, 1339 (8th Cir. 1989) (quotations omitted). If the moving party shows there are no genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing a genuine issue for trial. Donovan, 298 F.3d at 529.

A fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The basic inquiry is whether the evidence presents a sufficient disagreement to require full consideration on the merits by a jury, or whether it is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., 418 F.3d 820, 832 (8th Cir. 2005).

When the unresolved issues in a case are primarily legal rather than factual, summary judgment is particularly appropriate. Mansker v. TMG Life Ins. Co., 54 F.3d 1322, 1326 (8th Cir. 1995). However, although summary judgment may be an appropriate and useful tool to avoid useless and time-consuming trials, "[it] should not be granted unless the moving party has established the right to a judgment with such clarity as to leave no room for controversy." Vacca, 875 F.2d at 1339 (citations omitted).

## II.   Standards for Lack of Capacity and Undue Influence

Lack of capacity and undue influence are issues that are "heavily fact-based." Alliant Techsystems, Inc. v. Mark, 465 F.3d 864, 873 (8th Cir. 2006). Under North Dakota law, and federal common law applicable in ERISA cases, a contestant challenging the validity of a change of beneficiary must show by a preponderance of the evidence that the change of beneficiary was the product of undue influence. Alliant Techsystems, Inc. v. Marks, 04-3539, 2008 WL 906255 *4 (D. Minn. Mar. 31, 2008); In re Burris' Estate, 72 N.W.2d 884, 889 (N.D. 1955). The same burden applies to the issue of competence. Alliant Techsystems, Inc., 2008 WL 906255, at *5.

### 1.   Undue Influence

North Dakota recognizes four elements for establishing undue influence: (1) an individual was subject to undue influence; (2) the existence of the opportunity to exercise undue

5

influence; (3) a disposition to exercise undue influence; and (4) a result that appears to be the effect of undue influence. In re Estate of Howser, 639 N.W.2d 485, 488 (N.D. 2002) (setting forth the elements in the context of a will contest). "The determination of whether undue influence exists is a fact and ordinarily established by circumstantial evidence." Id. The issue of undue influence ought to be submitted to the jury when there is sufficient evidence - that is, more than a mere suspicion, with regard to each essential element. In re Estate of Dion, 623 N.W.2d 720, 728 (N.D. 2001).

  While the deposition testimony submitted to the Court establishes that Tompkins was an independent and strong-willed woman, her health was rapidly deteriorating when she changed the beneficiary. During the last few days of her life, Tompkins' physician notes Tompkins was in various stages of alertness and confusion. Moreover, the transcript of the telephone calls to Vanguard occurring within hours of the beneficiary designation change confirm Tompkins was on morphine, she would "float[] in and out" of alertness, and she had difficulty communicating. The person facilitating the change was Tompkins' sister, the new beneficiary's mother. A fact question exists as to whether Tompkins was subject to undue influence when she made the beneficiary change.

  Whether the opportunity to exercise undue influence existed, Kabanuk concedes that "arguably there is an issue of fact as to the second element." (Doc. #46, p. 10). According to Denise Kabanuk's own words, Tompkins was in the hospital, medicated, and in declining physical health. Stuart claims she was restricted by Tompkins' family from even calling Tompkins. Denise Kabanuk took control of effectuating the change of beneficiary, benefitting her daughter. The Court finds Stuart has raised a fact question as to whether the opportunity to exercise undue influence existed.

As to the third element, disposition to exercise influence, Denise Kabanuk was Tompkins's sister.  According to Stuart, Tompkins was not close to her family.  Nevertheless, the day before Tompkins' died, Denise was in the hospital facilitating the beneficiary change in the name of her daughter.  Days before she effectuated this change, she had Tompkins sign a change of beneficiary letter for a life insurance policy Tompkins never owned.  Moreover, Denise Kabanuk was aware of the tumultuous relationship between Tompkins and Stuart. She was aware that Stuart assaulted Tompkins during their relationship, and believes Tompkins lied when asked about the cause of her physical injuries.  She was also aware that Stuart stole from Tompkins.  Denise Kabanuk also prohibited Stuart from calling Tompkins.  The Court finds there is sufficient evidence to raise a fact question on the third element.

Finally, the fourth element is whether the result appears to be the effect of undue influence.  Denise Kabanuk effectuated the beneficiary change, removing the woman that was in a relationship with Tompkins for nearly 10 years to her daughter.  Before Stuart, Tompkins listed the name of another companion as the beneficiary.  Thus, before this final change, Tompkins had never listed a family member to be the beneficiary.  Courts are not to re-designate beneficiaries in order to have them conform to "natural dispositions", nor should they impose their own moral standards or familial preferences upon litigants.  Lyle v. Bentley, 406 F.2d 325, 331 (4th Cir. 1969).  The issue of whether Tompkins was unduly influenced is one for a jury to decide.

After considering on all the evidence, the Court finds there are sufficient factual disagreements that raise genuine issues for trial and require full consideration on the merits by a jury.  Accordingly, the Court finds Kabanuk is not entitled to judgment as a matter of law on the issue of undue influence.

2.     Lack of Capacity

An individual's capacity is presumed and the burden of proving the lack thereof is upon the contestant. Matter of Estate of Stanton, 472 N.W.2d 741, 746 (N.D. 1991). The critical inquiry in determining capacity is the condition of the mind at the time the event occurs. Id. In the context of testamentary capacity, North Dakota has established the following standard:

> Testator must have sufficient strength and clearness of mind and memory, to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and nature of the act which he is about to perform, and the names and identity of the persons who are to be the objects of his bounty, and his relation towards them. He must have sufficient mind and memory to understand all of these facts; ... He must also be able to appreciate the relations of these factors to one another, and to recollect the decision which he has formed.

Matter of Thomas' Estate, 290 N.W.2d 223, 225 (N.D. 1980) (quoting Stormon v. Weiss, 65 N.W.2d 475, 504-05 (N.D. 1954)). There is a dispute as to whether Tompkins had a "clearness of mind" to understand what she was doing when she changed the beneficiary from Stuart to Kabanuk. It is unclear from the evidence whether Tompkins was on morphine at the moment she signed the form. Denise Kabanuk informed the Vanguard representative at the time of the change that Tompkins was on morphine, but she later recanted that statement during her deposition. However, it is undisputed that Tompkins' health was failing and her sister expressed concern that Tompkins could die shortly. While Kabanuk and Jayne McGhan believe Tompkins was competent, Tompkins' own treating physician did not opine one way or another whether Tompkins was likely competent to understand what she was doing when she signed the form.

Further, the transcript of one of the telephone calls with Vanguard indicates Tompkins needed prompting when asked for her address. Tompkins also expressed difficulty understanding the Vanguard representative. Whether she was having difficulty hearing, talking, or understanding is an issue for a jury to resolve. The Court finds there are sufficient factual

disputes regarding whether Tompkins understood what she was doing when she signed the beneficiary change form, whether she was being unduly influence, and whether she was of sufficient mind to understand what was happening; therefore, the Court will let a jury decide which party is entitled to the funds in Tompkins' 401(k) account.

## DECISION

For the foregoing reasons, Elisha Kabanuk's motion for summary judgment is **DENIED**. The parties should be aware that there was a criminal trial set to begin on October 13, 2009, the date this trial is also set to begin, but the criminal matter is expected to resolve; therefore, the parties should be ready for trial on October 13, 2009.

**IT IS SO ORDERED**.

Dated this 16th day of September, 2009.

/s/ Ralph R. Erickson
Ralph R. Erickson, District Judge
United States District Court